UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MICHAEL D. BAILEY,

                 **Plaintiff,**

-vs-                                  **Case No.  6:06-cv-1578-Orl-19JGG**

FINAL TOUCH ACRYLIC SPRAY
DECKS, INC.,

                 **Defendant.**

_____

## ORDER

This case comes before the Court on the following:

1.      Defendant's Dispositive Motion for Summary Judgment (Doc. No. 21, filed Aug.
10, 2007);

2.      Brief in Support of Defendant's Dispositive Motion for Summary Judgment (Doc.
No. 22, Aug. 10, 2007); and

3.      Plaintiff's Response to Defendant's Motion for Summary Judgment and
Incorporated Memorandum of Law (Doc. No. 27, filed Oct. 5, 2007).

### Background

Plaintiff Michael D. Bailey worked as a pool deck painter for Defendant Final Touch Acrylic

Spray Decks, Inc. during the fall of 2005.  (Doc. No. 1, filed Oct. 12, 2006, ¶ 4).  He now sues

Defendant under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and the Florida

Civil Rights Act ("FCRA"), alleging that the company maintained a racially hostile work

environment and terminated him in retaliation for complaining about incidents of racial

discrimination.  (*Id.* at ¶¶ 12-15, 17-20, 22-28, 30-36).

Plaintiff is an African-American male who has been regularly employed as a construction worker and painter since high school.  (Doc. No. 1, ¶ 2; Doc. No. 23-2, filed Aug. 10, 2007, pp. 8-18).  Plaintiff began working for Final Touch in August[1] of 2005.  (Doc. No. 23-2, p. 18).  Plaintiff was hired after his roommate and friend, Rob Baker, mentioned to Final Touch's owner, Glenn Sadowski, that Plaintiff was looking for work.  (*Id.* at p. 19).

At the point Plaintiff was hired, Sadowski and Plaintiff had already known each other for several years.  (*Id.* at p. 19.)  Rob Baker and Plaintiff were long-time friends, and Baker dated Sadowski's sister-in-law, Sheena.  (*Id.* at p. 20).  Plaintiff and Sadowski were cordial, although not necessarily friends, having occasionally seen each other at social events.  (*Id.* at p. 21).  After learning that Plaintiff was looking for a job, Sadowski instructed Plaintiff to show up for work at the Final Touch garage.  (*Id.*)

Plaintiff was immediately assigned to Final Touch's "finishing crew," which performed painting work on decks.  (*Id.* at p. 24).  He was one of two African-American employees at Final Touch.  (*Id.* at p. 33).  The other employee, Tim, worked on a different crew called the "mud crew."  (*Id.*)  In total, Final Touch had twenty-three employees.  (Doc. No. 23-4, ¶ 4).

During the first three months of his employment, Plaintiff recalls several employees using racial slurs, including the word "nigger," in front of him.  (Doc. No. 23-2, p. 29).  Plaintiff did not feel that the comments were made directly at him, but he decided to report the matter to Sadowski, who in turn spoke with the crew members.  (*Id.*)  Afterwards, the comments were less common, although some employees occasionally made a "slip."  (*Id.* at p. 33).

---

[1] Plaintiff's complaint states that he began working for Final Touch in October of 2005. (Doc. No. 1, ¶ 4).  However, Plaintiff stated in his deposition that he began working for Final Touch in August of 2005.  (Doc. No. 23-2, p. 18).

Plaintiff reports two discrete incidents of discrimination during December of 2005. (*Id.* at pp. 34-35). The first incident began one morning when Sadowski emerged from his office and asked a group of employees, including Plaintiff, whether the mud crew was gone. (*Id.* at p. 35). The employees responded, "yes, why?", and Sadowski went to his truck and retrieved an African-American Santa Claus. (*Id.*) Sadowski plugged the Santa Claus into an outlet, causing it to sing and turn back and forth. (*Id.*). Everyone there "had a good laugh." (*Id.*)

Although the Santa Clause sung normal songs, Plaintiff felt that the display was discriminatory. (*Id.* at pp. 36-37). In particular, Sadowski had asked whether the mud crew was present, which Plaintiff interpreted as asking whether Tim, the only other African-American, was present. (*Id.* at p. 37). During the incident, a co-worker named Garret turned around and gave Plaintiff a "blank stare." (*Id.* at p. 36). Plaintiff also recalls one employee turning to another and stating, "Tell me that's not racially motivated." (*Id.*)

Afterwards, Plaintiff talked to Garret, who said that he could tell Plaintiff was upset during the incident. (*Id.* at p. 39). However, despite feeling upset, Plaintiff did not believe that the particular incident was directed at him. (*Id.* at p. 38). He worked a normal day afterwards and never complained to anyone other than Garret. (*Id.* at p. 39).

Sadowski states that he bought the Santa Claus at Wal Mart and brought it to work "to create a holiday ambiance during the Christmas Holiday Season." (Doc. No. 23-4, ¶ 5).

The second incident occurred on December 20, 2005. (*Id.* at. p. 40). Upon arriving at work that morning, Plaintiff encountered an unusual display. (*Id.*) During the previous day, an employee named Mike had created a phallic-shaped hat out of newspaper and scotch tape. (*Id.* at p. 41.) The hat had a "penis coming . . . out of the forehead" and two wadded balls of tape at the base. (*Id.* at

p. 44.)   Mike had worn the hat that afternoon and left it at work overnight.  (*Id.* at p. 41).   At the time, Plaintiff did not find the hat to be funny, nor did he find it to be upsetting.  (*Id.*)

The next day, Plaintiff found the hat on top of a paint can outside of Sadowski's office.  (*Id.* at p. 45).  Four one-inch "black baby dolls" were arranged in a circle around the base of the hat.  (*Id.* at pp. 40, 45-46).  Somebody had cut out the tip of the hat and inserted a fifth "black baby doll" feet-first, as if the doll's head was the tip of a penis.  (*Id.* at p. 46.)  Plaintiff says that everyone at the office stood around the display and laughed.  (*Id.* at p. 49.)  Although Plaintiff did not find the black baby dolls to be inherently offensive, he was upset by the context in which the dolls appeared and the way that his co-workers reacted.  (*Id.*).  Sadowski, on the other hand, said that he brought the black baby dolls to work because a co-worker's fiancé thought the dolls were cute.  (Doc. No. 23-4, ¶ 6)

Plaintiff immediately went to a nearby gas station to look for a camera to purchase.  (Doc. No. 23-2, p. 47).  Unsuccessful, he returned to the office after five minutes and decided to confront Sadowski about the dolls.  (*Id.*)

Plaintiff knocked on Sadowski's door, entered, and saw Sadowski talking to a supervisor, Andy Pilburn.[2]  (*Id.* at p. 47).  Plaintiff immediately asked "what was up with the black baby dolls." (*Id.* at p. 59).  Sadowski replied, "What, Mike, if you don't like it, call the NAACP."  (*Id.* at p. 59). Plaintiff then said, "I think this is bull shit.  I shouldn't have to come to work and deal with this stuff."  (*Id.* at p. 60).   Sadowski responded, "You don't have to.  You're fired.  Get out of here."

---

[2] Plaintiff recalls Andy Pilburn being present for part of the argument, including when Sadowski told Plaintiff to call the NAACP.  However, Pilburn left as the fight escalated.  (Doc. No. 23-2, at p. 61.)  Sadowski refers to Andy Pilburn as his supervisor, although Sadowski also refers to himself as the owner of Final Touch.  (Doc. No. 23-4, at p. 2).

(*Id.*) Sadowski then paused and said, "No, no no.  Hold on.  You can stay.  I will make your life so miserable, you will want to quit."  (*Id.*)  After some more argument, Sadowski pushed Plaintiff out of the office and told him to "get the fuck out of here."  (*Id.* at p. 61.)  Plaintiff shut the door, called Sadowski a "punk," and left.  (*Id.*)

Sadowski states that Plaintiff was fired because he left the job site without permission, and "[i]f any employee leaves the job site without permission, they are terminated."  (Doc. No. 23-4, ¶ 7).  Plaintiff disputes this statement, claiming that he and several co-workers had previously gone to the same gas station to get soft drinks and snacks without objection.  (Doc. No. 27-2, ¶ 3).  Plaintiff contends that Sadowski never mentioned leaving work as a reason for Plaintiff's termination, and at the point Plaintiff was terminated, his workday had not yet begun.  (*Id.* at ¶ 4.)

Sadowski also says that Plaintiff was fired for being insubordinate, particularly by barging into Sadowski's office while he met with Andy Pilburn.  (Doc. No. 23-4, ¶7).  Sadowski contends that Plaintiff was being aggressive and used profanity.  (*Id.*)  Plaintiff again disputes this reasoning, stating that Sadowski often used profanity and accepted it at the workplace.  (Doc. No. 27-3, ¶5).

As a general matter, Plaintiff states that he has experienced discrimination throughout his entire life.  (Doc. No. 23-2, p. 56).  He also states that the environment at Final Touch was not any different than other painting and construction jobs.  (*Id.* at p. 58.)

Plaintiff filed this suit on October 12, 2006.[3]  (Doc. No. 1).  Plaintiff's complaint contains four counts: (1) a claim under Title VII for maintaining a hostile work environment; (2) a claim under the FCRA for maintaining a hostile work environment; (3) a claim under Title VII for unlawful retaliation; and (4) a claim under the FCRA for unlawful retaliation.  (*Id.* at ¶¶ 11-36).

Defendant filed a motion for summary judgment on August 10, 2007.  (Doc. No. 21). Defendant argues that summary judgment is appropriate because no genuine issues of material fact remain and it is entitled to judgment as a matter of law on all of Plaintiff's claims.  (Doc. No. 22, p. 2).  Defendant argues that Plaintiff lacks even a "scintilla" of evidence that a hostile work environment existed.  (*Id.* at p. 8)  Furthermore, Defendant argues that Plaintiff has failed established a prima facie case of retaliation and offered no evidence to refute the legitimate reasons for his termination.  (*Id.* at p. 12).    Plaintiff contends that Defendant is not entitled to judgment as a matter of law on any claim.  (Doc. No. 27, p. 2).  Specifically, Plaintiff argues that a reasonable jury could interpret the "black baby doll" incident, coupled with Sadowski's inflammatory response, as sufficient to create a hostile work environment.  (*Id.* at p. 8).  Plaintiff also argues that he established a prima facie case of retaliation by presenting evidence that he engaged in a good-faith opposition to discriminatory behavior and was fired as a result.  (*Id.* at pp. 9-10).  Moreover, Plaintiff believes that genuine issues of material fact exist regarding the Defendant's motive for displaying the black Santa Claus and the propriety of its reasons for terminating Plaintiff.   (*Id.*)

---

[3] At some point after his termination, Plaintiff also filed a charge with the Equal Employment Opportunity Commission ("EEOC").   However, the only documentation from the EEOC proceedings in the record is a letter that the EEOC sent to Plaintiff regarding Defendant's position. According to this letter, Defendant claimed that it terminated Plaintiff for leaving the job site and never returning.  (Doc. No. 27-3, p. 1).  Further, Defendant's position was that "Ms. Glenn Sadowski" purchased the black Santa clause for a friend and meant no offense by it.  (*Id.*) Defendant also denied the existence of a penis-shaped hat.  (*Id.*)

**Standard of Review**

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is only appropriate when the evidence is such that a reasonable jury could not return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. The moving party has the burden of proving that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment. *Id.*

**Analysis**

**I.    Title VII and the FCRA's Basic Framework**

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Generally, employment

discrimination claims based on circumstantial evidence[4] are analyzed under burden shifting framework whereby the employee must first establish a prima facie case of discrimination. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-83 (11th Cir. 1990). Once the employee establishes his prima facie case, an inference of discrimination arises, and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* After the employer articulates a legitimate nondiscriminatory reason for the action, the employee must prove that the reason is merely a pretext for discrimination. *Id.* The employer's burden is merely one of production, and the employee always bears the burden of proving discrimination by a preponderance of the evidence. *See id.* When considering a motion for summary judgment, an employer is entitled to summary judgment by producing "evidence of legitimate nondiscriminatory reasons for the employment action" which the employee fails to rebut with "concrete evidence in the form of specific facts" that show the employer's proffered reason is a pretext for discrimination. *Id.* Conclusory allegations are not sufficient for an employee to survive a motion for summary judgment. *Id.*

The FCRA is Florida's state law analog to Title VII and is governed by the federal case law interpreting Title VII. *Natson v. Eckerd Corp., Inc.*, 885 So. 2d 945, 947 (Fla. 2004).

---

[4] The parties agree that this case involves indirect, circumstantial evidence of discrimination and is therefore subject to the burden-shifting framework. (*See* Doc. No. 27, pp. 5-6; Doc. No. 22, p. 7). Plaintiff also states that the case features "direct evidence" of discrimination. (Doc. No. 27, p 8). However, Plaintiff has not characterized any specific evidence as "direct," and the entirety of Plaintiff's analysis proceeds under the burden-shifting framework. (*See* Doc. No. 27, pp. 5-11). Thus, the Court will analyze all of Plaintiff's evidence under the burden-shifting framework and will not engage in a separate "direct evidence" inquiry. *See, e.g., Early*, 907 F.2d at 1081-82 (distinguishing between direct and circumstantial evidence of discrimination).

## II.    Plaintiff's Claims under Title VII and the FCRA

### A.    Hostile Work Environment

An employee may establish a violation of Title VII by proving that his employer maintained a "hostile work environment." *Miller v. Kenworth of Dothan*, *Inc.*, 277 F.3d 1269, 1275-76 (11th Cir. 2002). A hostile work environment exists where "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993))(internal quotation marks omitted). To establish a hostile work environment claim, the plaintiff must show:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Id.*

In this case, Defendant solely challenges the fourth prong of Plaintiff's claim: whether the harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment. (Doc. No. 22, p. 8). Harassment is only considered severe and pervasive if an employee can meet both an objective and subjective test. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999), *cert. denied*, 529 U.S. 1068 (2000). The employee must not only believe that the conduct was sufficiently severe and pervasive as to alter the conditions of his employment but his belief must be objectively reasonable, whereby a reasonable person in his position would also believe the conduct was abusive. *Id.* The Eleventh Circuit has set forth the following factors for

courts to consider in determining whether conduct satisfies the objective portion. *Id.* Courts should make their determination based on the totality of the circumstances after considering the: (1) frequency of the conduct; (2) severity of the conduct; (3) whether the conduct is physically threatening or humiliating; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Id.* Sporadic, isolated incidents of harassment are insufficient to establish a hostile work environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *Barrow v. Ga. Pac. Corp.*, 144 Fed. Appx. 54, 57 (11th Cir. 2005).

In determining whether an "objectively" hostile work environment existed, several cases have turned on the issue of frequency. For example, in *Barrow v. Georgia Pacific Corp.*, the plaintiff complained that he viewed racially offensive symbols, including the letters "K.K.K", and heard a number of racial slurs over a fourteen year period. *Barrow*, 144 Fed. Appx. at 57. The court found that his claims were "isolated and sporadic" because the discriminatory acts, although offensive, occurred only a few times per year rather than during a "short and intense period." *Id.* at 58. *Compare, e.g., U.S. EEOC v. FLTVT, LLC*, 6:05-cv-1452, 2007 WL 3047136, *5 (M.D. Fla. Oct. 18, 2007) (rejecting a hostile work environment claim where numerous racial slurs were used the workplace, but no one employee heard more than a few slurs, and most employees were not aware of the slurs that the other employees heard), *and Mendoza*, 195 F.3d at 1247 (rejecting a hostile work environment sexual harassment claim based on one incident of slight touching, one comment, three lewd "sniffing" sounds, and constant "following and staring" over an eleven month period), *with Mack v. ST Mobile Aerospace Engineering, Inc.*, 195 Fed. Appx. 829, 837-38 (11th Cir. July 31, 2006) (finding a hostile work environment based on continuous use of racial slurs and graffiti over several years).

Regarding the issue of severity, courts have routinely found that racial slurs such as "nigger" are "severe," while less clearly-racial terms such as "ghetto" are not. *See, e.g., Harrington v. Disney Reg. Entertainment, Inc.*, No. 06-12226, 2007 WL 3036873, *11-12 (11th Cir. Oct. 19, 2007). When comments lack clear racial overtones, the most important consideration is whether the speakers were motivated by racial animus. *Aman v. Cort Funiture Rental Corp.*, 85 F.3d 1074, 1082-84 (3d Cir. 1996) (noting that even unsophisticated employees have learned not to use certain "talsmanic" racial slurs, and a court must therefore determine whether comments are motivated by racial animus). Racially-charged symbols such as "K.K.K.," nooses, and the confederate flag can be characterized as severe if found in sufficient numbers. *See  Mack v. ST Mobile Aerospace Engineering, Inc.*, 195 Fed. Appx. at 837-38 (finding that racial slurs, along with graffiti depicting nooses, swastikas, confederate flags and the letters "KKK" were "severe"); *Perkins v. U.S. Airways, Inc.*, 8 F. Supp. 2d 1343, 1351 (M.D. Fla. 1998) (finding that "racial pictures" on a bathroom wall, a newspaper article regarding a lawsuit by black employees hung in the break room, and a clay doll with racial overtones were "pervasive").

Defendant argues that it is entitled to judgment as a matter of law because Plaintiff has not presented evidence to demonstrate that the discrimination at Final Touch was sufficiently pervasive or severe to alter the terms and conditions of employment. (Doc. No. 22, pp. 2-3, 8). Defendant characterizes Plaintiff as exceptionally sensitive, pointing to Plaintiff's statement that he has felt discriminated against his entire life and experienced similar work environments in other jobs. (*Id.* at p. 3). Defendant also emphasizes that the racial slurs were not directed at Plaintiff, and that Plaintiff admitted that he might allow his children (if he had children) to play with the "baby black dolls." (*Id.*)

Defendant is not entitled to summary judgment on Plaintiff's hostile work because the evidence is sufficient for a reasonable jury to find in Plaintiff's favor.  Plaintiff has demonstrated both a subjective and objectively-reasonable belief that the environment at Final Touch was sufficiently severe and pervasive as to alter the terms and conditions of his employment.  *See Mendoza*, 195 F.3d at 1246.

Plaintiff demonstrated his subjective belief when he confronted Sadowski after the "black baby doll" incident. (Doc. No. 23-2, at pp. 59-61).  While Plaintiff was able to deal with racial slurs and the black Santa Clause incident, the "black baby doll" incident strongly provoked him. (*Id.*)  Plaintiff specifically said that he should not have to "come to work and deal with this stuff."  (*Id.* at p. 60).  The fact that Plaintiff reports experiencing similar experiences in past jobs may weigh against the sincerity of his subjective beliefs.  (*Id.* at p. 56).  However, this argument goes to the credibility of Plaintiff as a witness, a determination this court cannot make on a motion for summary judgment.  *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993).

Defendant also makes much of the fact that "these black baby dolls is [sic] something [Plaintiff] would probably let his kids play with." (Doc. No. 22, p. 4).  This argument entirely misses the point.  Plaintiff was not upset by the mere existence of the dolls.  (Doc. No. 23-2, p. 49).  Plaintiff was upset because the dolls were used in a way that demeaned African-Americans.  (*See id.*)  The purpose of the entire display, in Plaintiff's mind, was to make fun of African-Americans. (*Id.*)

Plaintiff's belief can be construed as objectively reasonable based on the totality of the circumstances.  First, the discriminatory conduct was relatively frequent.  Unlike *Barrow* and other cases where discriminatory conduct took place over a course of several years, Plaintiff experienced

several incidents over a short period of time.  (*Id.* at pp. 29, 34-35).  Plaintiff only worked for Final Touch for a few months, and the bulk of the discriminatory activity occurred in December of 2005. (*Id.* at p. 34).

Second, the discrimination could fairly be characterized as "severe." Plaintiff overheard the use of the word "nigger."  (*Id.* at p. 29).  Moreover, Plaintiff's ethnicity was used in a sexually explicit and demeaning style.  (*Id.* at p. 45-46).   And, by telling Plaintiff to "call the NAACP," Sadowski handled the incident in an inflammatory manner.  (*Id.* at p. 59-61).

The discrimination was humiliating, although not physically threatening.  The use of a slur such as "nigger" is obviously humiliating, especially when only one African-American is present among a mostly Caucasian crew.  (*See* Doc. No. 23-2, p. 32).   Plaintiff's co-workers laughed at the Santa because it was African-American, and a person in Plaintiff's position, as the only African-American present, could easily have been humiliated.  Furthermore, Plaintiff recalls his co-workers laughing at the "black baby dolls," a display apparently designed to demean African-Americans. (*Id.* at p. 49).

Defendant emphasizes the fact that Plaintiff did not feel that the racial slurs were directed at him.  (Doc. No. 22, p. 3).  While this consideration may make the conduct less humiliating, the Title VII case law does not require discriminatory conduct to be directed toward the plaintiff. *Edwards*, 49 F.3d at 1522 ("A plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at [him].")(citing *Bubsy v. City of Orlando*, 931 F.2d 764, 785 (11th Cir. 1991).

Finally, the conduct could objectively interfere with an reasonable employee's job performance. Granted, painters and construction workers may often work in a crude environment.[5] However, Plaintiff was one of two African-Americans among a company of twenty-three workers. (*See* Doc. No. 23-2, p. 32; Doc. No. 23-4, ¶ 4). Racially-offensive incidents could easily isolate an employee in Plaintiff's position and interfere with his ability to work. Moreover, Sadowski's manner of dealing with the "black baby doll" incident would further impede a reasonable worker from performing his or her job.

Thus, Plaintiff has produced sufficient evidence to satisfy the "subjective" and "objective" tests. As a result, a reasonable jury could find that the work environment at Final Touch was severe or pervasive enough to alter the terms and conditions of employment and create a discriminatorily abusive working environment. Because Plaintiff has established a prima facie case, Defendant is not entitled to summary judgment on Plaintiff's hostile work environment claim.

### B.      Plaintiff's Claim for Unlawful Retaliation

Title VII's anti-retaliation provision "forbids an employer from discriminating against an employee or job applicant because that individual opposed any practice made unlawful by Title VII or made a charge, testified, assisted, or participated in a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2408 (2006) (internal quotations omitted)). Thus, an employee must prove that: (1) he was engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) there is a causal connection between the

---

[5] *See, e.g., Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1538 (10th Cir. 1995) (recognizing a so-called "blue collar exception" for certain Title VII sexual harassment claims).

protected activity and the adverse action.  *Weeks v. Harden Mfg. Corp*, 291 F.3d 1307, 1311-12 (11th Cir. 2002).

An employee may establish that he engaged in statutorily protected expression by showing that he had "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Id.*  Thus, the plaintiff must demonstrate both a "subjective" and "objectively reasonable" belief that the employer was engaged in unlawful employment practices.  *Id.* at 1312.

The term "causal connection" is interpreted broadly.  *Orquiola v. National City Mortg. Co.*, — F. Supp. 2d —, 2007 WL 174412, *20 (N.D. Ga. Jan. 16, 2007).  The plaintiff merely has to prove that the protected activity and the negative employment action "are not completely unrelated." *Id.*; *see also EEOC v. Reichhold Cems., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993).

Once the employee establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999).  At that point, the plaintiff must demonstrate that the employer's proffered non-discriminatory reasons "are a pretexual ruse designed to mask retaliation."  *Id.  See also Crawford .v City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).

In this case, Defendant challenges the first and third prongs of Plaintiff's prima facie case. Specifically, Defendant argues that Plaintiff's act of complaining about the "black baby dolls" is not protected because "[a]s a matter of law this is not and can not be protected conduct as an intended protection by our legislatures."  (Doc. No. 22, p. 11).  Defendant argues that no causal connection exists between Plaintiff's act of complaining and his termination because "it is unreasonable for a reasonable person to believe that an employee would be fired for complaining about [the dolls]."

-15-

(*Id.* at p. 11-12).  Finally, Defendant also argues that it has established a legitimate, uncontroverted reason for terminating Plaintiff.  (*Id.* at p. 12).

Defendant is not entitled to summary judgment on Plaintiff's retaliation claim because (1) Defendant is not entitled to judgment as a matter of law on any prong of Plaintiff's prima facie case, and (2) genuine issues of material fact remain as to Defendant's actual reason for terminating Plaintiff.

Plaintiff has presented sufficient evidence to establish that he had a good faith, reasonable belief that the Defendant was engaged in unlawful employment practices, and therefore he engaged in statutorily protected conduct.  Plaintiff immediately confronted Sadowski after the "black baby doll" incident and told him that he should not have to deal discriminatory conduct at work.  (Doc. No. 23-2, p. 60).[6]

Moreover, Plaintiff had an objectively reasonable belief that Defendant's conduct was unlawful.  Without citing any legal authority whatsoever, Defendant claims that Plaintiff's act of complaining about the dolls is unprotected as a "matter of law."  (Doc. No. 22, p. 11).  This court has already determined that Plaintiff presented a viable hostile work environment claim.  Thus, Plaintiff's belief was "objectively reasonable in light of the facts and record presented." *Weeks*, 291 F.3d at 1312.

Plaintiff has also demonstrated a causal connection between the act of complaining and his termination.  Plaintiff must only show that the two events were not "completely unrelated."

_____

[6] Again, Defendant erroneously relies on the fact that Plaintiff might let his hypothetical children play with the dolls.  (Doc. No. 22, p. 11).  Plaintiff was obviously upset about the *context* in which the dolls appeared.  (Doc. No. 23-2, p. 49).  Thus, Plaintiff could have possessed a good-faith belief that the doll display in its context constituted unlawful discrimination.

*Orquiola*, 2007 WL 174412 at *20.  This standard is easily satisfied in this case.  Sadowski

terminated Plaintiff immediately after Plaintiff had complained about the dolls.  (Doc. 23-2, p. 60).

Defendant unconvincingly argues that "it is unreasonable for a reasonable person to believe that an

employee would be fired for complaining about [the dolls]."  (Doc. No. 22, p. 11).  This argument

is circular and has no basis in the case law.  Contrary to Defendant's assertion, a causal connection

exists unless the protected activity and adverse action are "completely unrelated." *Orquiola*, 2007

WL 174412 at *20.

Finally, genuine issues of material fact remain regarding Defendant's proffered reasons for

terminating Plaintiff.  Defendant offered two reasons for the termination: (1) Plaintiff left work

without permission, and (2) Plaintiff "barged" in during Sadowki's meeting with Pilburn.  In a

motion for summary judgment, the court must draw all inferences in favor of the non-moving party.

*See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993).  The court must deny

summary judgment if one of these inferences creates a genuine issue of material fact.  *Id.*  Here, the

conflicting evidence supports an inference, in each instance, that the proffered reasons were

pretexual.

Plaintiff has offered evidence directly conflicting with Defendant's first proffered reason.

 (Doc. No. 27-2, ¶ 3).  Specifically, Plaintiff contends that he and other workers were permitted to

leave the office without specifically requesting permission in each instance.  (*Id.*)  Plaintiff also

states that he left and returned to the office before his workday had even begun.  (*Id.* at ¶ 4).

Plaintiff has also presented evidence that conflicts with Defendant's second proffered reason.

 (*Id.* at p. 2).  According to Plaintiff, profanity was regularly used and tolerated at Final Touch.  (*Id.*

at p. 2).  Moreover, to the extent Defendant justifies the termination on Plaintiff's use of profanity,

-17-

its reasoning is inherently contradictory, as Sadowski's last words to Plaintiff were profane.  (Doc. No. 23-2, p. 61).

The overall progression of the December 20th conversation contradicts both of Defendant's proffered reasons for Plaintiff's termination.  The conversation started with Plaintiff asking " what was up with the black baby dolls." (*Id.* at p. 59).  Sadowski then replied, "What, Mike, if you don't like it, call the NAACP." (*Id.* at p. 59).  Plaintiff said in response, "I think this is bull shit.  I shouldn't have to come to work and deal with this stuff." (*Id.* at p. 60).  Sadowski responded, "You don't have to.  You're fired.  Get out of here." (*Id.*)  The conversation apparently continued along these lines and ended with Sadowski pushing Plaintiff out of his office.  (*Id.* at p. 61).  Sadowski did not mention the fact that Plaintiff had left the jobsite without permission or had barged into a meeting with his supervisor.  The focus of the conversation, based on this exchange, appeared to be the "black baby dolls." (*See id.* at pp. 59-61).

Thus, Plaintiff has produced sufficient evidence to establish a prima facie case and demonstrated the existence of genuine issues of material fact regarding Defendant's proffered reasons for his termination.  As a result, Defendant is not entitled to summary judgment on Plaintiff's retaliation claim.

### Conclusion

The Court **DENIES** Defendant's Dispositive Motion for Summary Judgment (Doc. No. 21, filed Aug. 10, 2007).

**DONE** and **ORDERED** in Chambers in Orlando, Florida on November 6 , 2007.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record